All rise. Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th versus now is in accordance with law. God save the United States and the United States Supreme Court. Thank you. Please be seated. Good afternoon. Welcome to the 11th Circuit. And today we have one case that we will be hearing. It's the case of Whitton v. Secretary of the Florida Department of Corrections. I know you're all familiar with our lighting system, but just as a reminder, when the yellow light goes on, you have two minutes left. When the red light goes on, your time is up. We ask that you please try to go ahead and respect that red light. Of course, if we have questions for you that take you over the red light, please do answer them. We want to hear the answers or we wouldn't be asking the questions. All right. And with that, we will begin with Mr. Gunn. May it please the Court. Sean Gunn for Appellant Gary Whitton. I'd like to start with the false testimony issue involving Jake Ozio. Your Honors, the district court found that Ozio, a powerful witness for the state, lied to Mr. Whitton's jury when he said he heard Mr. Whitton confess. As the district court found, the confession never happened. Ozio made it up. The district court also found that Ozio lied when he told the jury he never expected favorable treatment on his own unrelated charges in connection with his testimony against Mr. Whitton. As the district court found, leniency in his own case was Ozio's sole motivation for fabricating the confession, and he did, in fact, receive favorable treatment. But where the district court went wrong was its analysis of whether the state knew or should have known Ozio's testimony was false under the Giglio standard. This Court should reverse on that issue. I'm hoping to make a few points about the merits, Your Honors, but I don't want to dodge the AEDPA issue. You know, I actually do have a question about the AEDPA issue. I mean, the question really is just, I'm not entirely sure that the district court was correct on that. And I just, I would like you to address that, I guess, before you go ahead. Sure. There were four unreasonableness, which I think animated most of the district court's decision was under D-2. This idea that the state created a situation where they could threaten a witness with perjury, even if he was going to offer truthful testimony, recanting his trial testimony. The witness wanted to correct his trial lies, but the state was able to intimidate him out of it. And then the state court, for no good reason, refused to allow an out-of-state testimony or deposition. And then went on to find that Mr. Whitten failed to present evidence in support of his claim. Yeah. I mean, I agree that that's weird, a weird situation. I guess, here's where I'm coming from on this. You know, I see criminal appeals, direct criminal appeals, all the time where a trial judge says, well, before I let this person testify, I'm going to appoint them counsel and make sure that they don't want to assert their Fifth Amendment rights or something like that. Because I just want to make sure that this witness knows that they could have some liability here. And, you know, nine times out of ten, you sit down on the record and the witness doesn't testify. Like, what is wrong? I guess, what is wrong about what the state court did here versus just sort of that, in my mind, run-of-the-mill situation? Well, I think what the state court did that was unreasonable is it prioritized this idea that OCO might be able to lie with impunity in this deposition, even though he would have been under the supervision of a Washington court and subject to Washington perjury laws. And it was not prioritizing Mr. Witten's access to critical evidence in his case. So I think the idea that OCO wouldn't have been subject to any repercussions if he had offered perjury in the deposition just doesn't make any sense. Right. The circuit court was overly focused on that. So I guess that's a little bit different. And maybe I'm wrong, but that seems a little bit different than what you led with. What you led with was sort of refusing to accept the testimony and allowing the state to say it was going to press perjury charges was the problem. It seems like you're saying the problem now is just not allowing the deposition to go forward. I think it's the whole package. It's the whole sequence of events. And then what comes out of the circuit court and then the Florida Supreme Court decision is, and this is how we tried to recognize this court's decision in PI discussing D2 and how it has to necessarily include some erroneous findings. What you see in the Florida Supreme Court decision are these findings that Witten failed to present any evidence because OCO refused to testify and did not engage at all with these facts about the state threatening OCO about the circuit court having this opportunity to take a deposition. In the circuit court, the state actually offered as an alternative, if the court doesn't want to completely block OCO's testimony, they can do it by live satellite transmission. If they had done that, the circuit court should have assessed OCO's credibility and decided he's not credible on that basis. But just to say, oh, he's not manning up and coming and facing these perjury charges, that's the core of the unreasonable. Okay. All right. Thank you. If I could just move to the merits, I want to address at the outset this controversy in the briefs over what the state knowledge prong of Giglio requires. The standard is whether anyone from the state knew or should have known of the perjury. So actual knowledge satisfies the Giglio standard, but so does willful blindness or even negligence according to Giglio. Can I ask you just a question about that? So as I read the Florida Supreme Court's opinion, sort of the key sentence, I guess, is, furthermore, even if OCO's trial testimony was false, witness not demonstrated that the state was aware that OCO intended to present false testimony. Does the word aware there, you think, necessarily denote actual knowledge or is that sort of capacious enough to include actual or constructive knowledge? I think they are referring to actual knowledge and that's something the district court talked about, but our argument is because the state court's decision is not entitled to deference because of this D-2 unreasonableness, that we look at the state knowledge prong de novo. So just so I'm clear, and I realize that I'm sort of hearkening back to the conversation you were having with Judge Brasher about the AEDPA issue, but so your argument is not in any way, shape, form or fashion that there's a D-1 problem here because the state court misstated the standard? So I think those are problems and the district court, so the district court did both, right? It had the D-2 unreasonableness based on this fact-finding process and resulting unreasonable findings and then it said, by the way, these two recitations of the Giglio standard implicate D-1. I don't think that if that is all we have, we could hang our hat on that because that just, I think it would amount to just scrutinizing the language of the decision too much. Got it. Okay. Our argument is it's unreasonable under D-2, so now we look at the state prong de novo. And the back and forth in the briefs of our friends from the Attorney General's office are asserting that the state has to have actual knowledge, and I just want to clarify, this court has said over and over again, the standard should have, Giglio itself says whether by negligence or design, it's the responsibility of the prosecutor. Cases from Supreme Court aiders and Brady even focus on the character of the evidence that was not given to the jury. We're not looking at the character of the prosecutor or any nefarious state action, although the evidence in this case, I think, does suggest that. I think this record does show actual knowledge, but relief is appropriate, even if this court assumes sort of the best of everyone from the state. It should find willful blindness or negligence. Can I ask you, so let's just assume that the district court was right to hold the hearing and kind of evade AEDPA. Are we reviewing the district court's assessment of this for clear error? Are we reviewing it de novo? How should we go about reviewing this issue about should have known? As to AEDPA or as to the? No, forget about AEDPA. On this issue, I mean, the district court holds the hearing, has the testimony, and then says, you know, I find that this guy lied, but I find that the state didn't know about it. You know, sorry, no Giglio. Yeah, I think, well, the legal issues are obviously reviewed de novo. The factual findings are reviewed for clear error, but the district court does make this finding that Ozio lied. He made up this entire confession. Yeah, so you went on now, and I guess my question is, when the district court eventually denies, what is, maybe this is the way to ask it, what is the basis of the district court's denial of the habeas petition on this? So there's three modules on this finding. There's false testimony, there's the confession that he completely fabricated, there's the stuff he says about whether he was offered or thought he was going to get anything, and then there's this piece about his juvenile record. So I would like to just tick through on each of those, the state knowledge arguments that we would make, and I think they show actual knowledge. And just before you do that, I mean, when you say you're going to tick through, I guess my point is, when the district court said they don't show actual knowledge, is that a fact finding? No, that's a legal conclusion. Okay, that was my question. What is the basis to say that's a legal conclusion? Well, I don't think the district court could have made a factual finding on that. There were no officers that testified that they even remembered Osio or even the case. Osio has been telling the same story for the last 20 years consistently, that they were aware. So I understand not always wanting to take the witness's subjective knowledge, but the witness here is clearly saying they knew about this. And you only have to look at some of the state's actions and other aspects of the case to make it seem pretty plausible, the threatening and assault of an FDLE agent, the repeated comments on Mr. Witten's invocation of his right to silence. So I think that the district court correctly found that Osio made up this confession, but then got sidetracked on Giglio should have. Oh, I'm sorry. Please go ahead. So if we conclude that the new or should have known finding is a factual finding, what's your best argument for why it was clearly erroneous? So Osio's testimony was clear that officers working on Witten's case, not Osio's, take him out of jail, they give him special treatment, they're discussing their need for evidence in this case that has nothing to do with Osio's case, and then they're bringing up this five-year mandatory minimum that Osio is facing. Osio was really clear. They were being slick, but everybody knew what was going on. They were talking about Witten's case in the front seat, and he's in the back seat concocting this story and testing it out with them, and they're correcting him when he gets things wrong. So given that we know that Osio made up the confession, it's just not plausible that he got enough facts right in the back seat of the car that the officers wouldn't think, oh, nothing's fishy about this confession. Did he also receive some direction from the prosecutor? Excuse me? Did he also receive some direction from the prosecutor about how to testify? He received prepping for his testimony the night before. He's not sure if it was the prosecutor, if it was somebody from law enforcement, but he was the night before prepped, told to change the substance of his testimony, as he told the district court, and Osio was clear. This guy knew I was BSing. So someone from the state prepped him for his testimony. That, we think, is actual knowledge as well. But, again, even at a minimum, giving all the officers and prosecutors the benefit of the doubt, assume they don't know what's going on and Osio's just thinking, oh, I'm going to make this up. The district court found that officers in this situation who are saying these things and talking about charges should have reason to know that a witness is likely to provide false information at that point. That's a finding by the district court as well. So at a minimum, the officers should have known over the course of multiple rides, bestowing favors and scaring Osio about his charges, that this confession needed to be checked out. All right. So then, I'm sorry, this might be a remedial question, but so if the district court makes the finding that officers in this circumstance, given all of the sort of the facts as they unfolded, should have known, then back to Judge Brasher's question, what was the basis for denying the habeas petition on state knowledge? Yes. Right. So the basis was the state didn't know? The basis, so he broke, the district judge broke it up into the different categories. So false confession, falsity is established, state knowledge is not established.  As to leniency, the district court implies no falsity because Osio was never promised anything, although I think that is wrong also, and then they also find the state didn't have knowledge as to that category as well. So I guess the gap for me, and again, this could be the dumbest question of all time, but you just said some version of the district court made a finding that in these circumstances the reasonable officer would have known, and yet nonetheless concludes, as a matter of fact, that the state knowledge element is not met?  And your argument is like those two things are sort of logically incompatible? Yes. Okay. So it's not necessarily that the district court didn't make the finding, back to Judge Brasher's question about whether this is a question of law or a question of fact, it's not that the district court didn't make the finding, it did make the finding, and you're just, I think, attacking it as clearly erroneous?  Okay. That's helpful. Yes. If I could just move to the, well, let me just step back and talk about the prosecutor on the false confession. Just because there is this bizarre occurrence at Osio's pretrial deposition where he includes a detail about the confession that we now know to be false, that's completely at odds of the facts of Witten's case, and the same detail surfaces in another case that the same prosecutor is prosecuting. It doesn't fit with that case either. So I think that should concern us with either rational or constructive knowledge as well. It would take willful blindness not to scrutinize Osio's story after that, especially because the prosecutors presumed to have knowledge of both of their files. Can I ask you this question? Because I, what is exactly, so no, like you said, I mean, no prosecutors testified about this. None of the... The prosecutor didn't testify in state post-conviction. Right. But, I mean, he didn't say, oh, yeah, we knew that guy was lying, right? You don't have anything like that. He never said, I don't know. Right. There's no memo in the file or anything like smoking gun kind of thing that says, like, they knew about this evidence. What, I guess, I have trouble with these sort of jailhouse niches informant stuff anyway. I would not use these people, I think, if I were a prosecutor. But what is exactly that they were supposed to have done to nail down whether he was lying or not, I guess? That's, you know, they've got someone who says, the defendant in this murder case told me that he committed the murder. You know, how do they use that? How do they examine that in a way to where they don't violate Giglio? Well, I think they just have to give some scrutiny, some investigation, something. Okay. What would that be? Interviewing Ozio again, comparing the pretrial statements of Ozio and McCullough, which contain some serious inconsistencies. The timeline where this happened is extremely implausible. Ozio, McCullough, and Witten only overlap at the jail for 48 hours. And Witten's been in the jail for 18 months, and suddenly, three months before his trial, these two confessions of service, the State had offered Witten a plea deal at that point. And as soon as these snitches came forward, the State said, on the record, we're withdrawing that deal and seeking the death penalty now because now we have these snitches. So that tells you what the State thought about its other evidence before these two snitches came forward. It also tells you the State thought that this was good evidence, I guess. It seems like your arguments are just that the State shouldn't have used the evidence, which, I mean, that's fine. That could be your argument. But when these jailhouse informants come forward, I guess I'm trying to think of something that a prosecutor can do to not violate Giglio except just saying, you know what, I'm just not going to believe these informants. Well, that goes back to assuming that there is no actual knowledge. But assuming there is no actual knowledge, I think they have to make some effort to check the story against the rest of the record. And the district court sort of agreed on this should-have point because what it came down to for the district court was that Osio's story didn't have a high likelihood or high possibility of being false, and therefore it was fine for the prosecutor just to put him up there and let the jury sort it out. So our argument, yes, is that the circumstances made the confession story implausible. The State, at a minimum, buried their head in the sand or was negligent even. Giglio says negligence is okay, so they didn't do anything. So that would be our argument. Are you saying that when you have a situation where you've got an informant, or in this case two informants, and their stories don't seem to match up and there are inconsistencies and lots of improbabilities, and one of them mentions a knife and there's no knife involved or recovered, whatever, in that kind of a situation, at some point the prosecution has an obligation to look beyond the face of the assertions. Is that what you're saying? Yes, and there's no indication on the record they did anything. On the knife issue, it's my understanding that that knife statement came up first in a pretrial deposition. Is that right? Yes. So was that deposition available to the defense? Yes. Okay. But the defense would have no way to know that the same detail had surfaced in a completely unrelated case. So the defense counsel would have had to know this other Suggs case, would have had to know the whole record for it to pop a flag that, hey, these two details are coming out in two cases. The prosecution would know and has constructive knowledge of both of all of those files. Well, you would still know, though, if you're a defense counsel, like my guy didn't throw a knife away in a ditch or whatever. So, I mean, obviously this guy is making this up. I mean, you would be able to pursue that line of inquiry as defense counsel. Sure, but of course the night before trial, Osio is told don't bring it up again and the trial doesn't come up again. Yeah. If I could, I'd love to say a few words just about the leniency angle to the false testimony. The district court really disproportionately focused on this. Osio told the truth because nobody did promise him anything. But that was not the extent of Osio's testimony as to leniency. Osio told the jury officers didn't offer any help, didn't suggest what he should say. It didn't enter his mind this would ever affect his case, and he wasn't at all worried about his charges. And that's all false, according to Mr. Osio's testimony. He was scared and was looking for a way out of his predicament. And Giglio does not require explicit promises or, as I said, nefarious state actors. This court in Haber and Brown has said even informal understandings, tentative offers, tacit agreements, no magic words are required, promise is not required. So the district court really zeroed in on promise for its false analysis. But there's all this other false testimony by Osio as to his leniency. And I'd just like to say that Giglio has to cover wink and nod understandings. And several courts and other circuits have recognized this. And there's an analogy to be drawn to the federal crime of bribing a public official under the Hobbs Act. Justice Kennedy has this famous concurrence where he says, the official and the payer need not state the quid pro quo and express terms, otherwise the law's effects could be frustrated by knowing winks and nods. So I think the same thing has to be true of Giglio. And if the court finds that there was a wink and nod understanding, it doesn't matter, there was no promise. And so maybe you're beginning to bleed into state knowledge. But you talked to us about state knowledge expressly with respect to the leniency piece. Because the first part of what you said there is that there's like tons of evidence of falsity. So what about state knowledge there? And I get the wink and nod thing begins to look like state knowledge as well. But will you just sort of unpack that a little bit? Yes. So on the police side, I'd just say that Osio's testimony is clear. That's what happened. It was a wink and nod understanding. So we have Osio's testimony. They made clear to him, he said, that he would not be serving five years on this mandatory minimum if he helped them out. So that would establish state knowledge. The officers, you know, no officer has ever, no prosecutor has ever specifically rebutted this. Everything is, I don't remember Osio, I don't remember the Witten case, which even the district court found dubious, given the notoriety and the violence involved. But on the prosecutor side, Atkinson also prosecuted Osio. Atkinson knew that Osio was released from custody and subpoenaed for Witten's trial on the same day. An actual condition on his judgment of release says return to testify in the Witten case. So when he gets up there and says, no connection between the two cases at all, the prosecutor being the prosecutor on both cases has to recognize that's not true. There was some connection between the two cases and the jury was entitled to hear about that. Finally, as to the prior record, Osio told the jury he has, quote, no prior record at all and it was, quote, his first crime ever. But the juvenile records and federal testimony showed he'd been arrested for violent acts. And the state, and Osio was clear, the state knew about this and told him to conceal it. And they used this to portray him as this scared young kid who was eminently credible. But it wasn't true. Osio had been arrested as a juvenile for violence. A few years after this trial, he was arrested again for burglary and served several years in a Texas prison. So he was not this scared high school kid that the state portrayed. Would you mind, just in the little bit of time you've got left, addressing with respect to the record issue, the materiality slash Brecht issue? Because I think that's where the district court sort of hangs its hat here, right? Yeah, I think it was significantly impactful for the jurors to hear matching accounts of a dramatic confession by Witten in which he says, I stabbed the bastard, particularly from the scared kid. This is a case with no murder weapon, no DNA, no robbery proceeds, and a pretty tenuous motive. So these snitches were critical to the case. And as I said, the state's view before trial was that they were absolutely critical to pursuing the death penalty instead of a plea bargain. I would, if I could, just say very briefly about the mitigation claim. I want to address this idea in the district court and the FSC decisions that the evidence was just cumulative to the penalty phase. I think that was unreasonable to say nothing categorically new was presented. The post-conviction evidence showed that these parents were not just abusive and neglectful. They were sadistic. The kids lived in terror. Knowing that the mother killed a baby sibling and that they could all be next. The rape of Mr. Witten's sisters by their dad and others, which other kids witnessed. Starvation. Forced to share dog food when the kids left them at home. So I think it was unreasonable for the Florida Supreme Court to say that this was all just cumulative evidence. I'll reserve the rest of my time. Thank you. All right. Thank you, Mr. Gunn. Mr. Rodriguez. May it please the court. Jason Rodriguez for the Attorney General's office. I want to begin and will spend the majority of my time talking about the OCO claims regarding the false testimony issues. But I did want to point this court to the record very quickly. The district court's order, document 119 at page 18. The district court found no matter what knowledge prong you use, Witten has failed to prove his claim. And this is exactly what the district court said on page 18 of its order. The bottom line is this. Mr. OCO testified falsely that he killed Mr. Malden. But Witten has not carried his burden to show that any representative of the state, the prosecutor, any member of the prosecution team, or even any law enforcement officer or correction officer knew or should have known or believed the testimony was false. OCO testified truthfully that he was promised nothing in exchange for the false testimony. I mean, there were a lot of weird things about Mr. OCO's testimony, especially when you compare it to Mr. McCall's and the 48-hour period and the fact that this knife comes up and there's no knife, and then they're telling him not to say this and say that and say it this way. I mean, at what point does the state have an obligation to do more than just accept at face value whatever someone might say? So you are, and this gets a little bit to the knowledge issue. And our position, the Attorney General's office position, is that actual knowledge is required of falsity. And that's going to be pretty hard to meet because the state isn't. I don't think that answers my question. At what point does the state have an obligation to start looking into this and not just take something at face value, especially when you're talking about a murder charge and a death penalty at issue? Your Honor, the state has no obligation to investigate further when the evidence before it is just merely inconsistent or anything like that. If it's entirely incredible, different story. But if all we've got is inconsistencies and the witness saying one thing here, adding another fact months and months later, the state has no obligation under due process, and certainly not under EDPA at this point. And so it's your view that the state can simply continue to disregard any kind of inconsistencies and improbabilities in the testimony of the witnesses that it presents and asks to have a jury vote to put to death? Yes, Your Honor. We trust juries to kind of be the ones to figuring that out. How could they figure it out if the prosecution has the information and doesn't disclose it, such as the knife situation, the fact that the prosecutor or the representative from the prosecutor's office met with Mr. Osio before he testified and told him what to say and what not to say and how to say things? So, Your Honor, I want to start with the knife. And the fact is the knife was disclosed. It came up. Right, but not the fact that the knife showed up in a different case as well and that, for whatever reason, it seems to keep popping up in the same cases. Your Honor, I do think it's important that that issue is not pursued in state court. We don't know what defense counsel knew about the knife or not, because that came up for the first time in federal court. There was no questioning or anything like that about, did you investigate the knife? Did you know it was tied to another murder? The record's totally silent on that. So we don't actually know what defense counsel knew at the time about that knife. Regarding the pretrial prep session that happened months and months after Osio had given the state really everything that it was going to use at trial, it's still not clear from the record what exactly the prosecution was telling him to say. As far as I can tell, it sounds like they were just saying, didn't you say this at this particular time or that this happened at this time? Not that they were coaching him. I want you to lie about this fact. I want you to say this even though he hadn't said it before. It looks like just a perfectly permissible pretrial prep session. The only thing they tell him about the knife is, don't bring it up, but if you're asked about it, don't lie about it. So this idea that they're coaching him and telling him exactly what to say, I don't think is entirely borne out by the record, because we don't know exactly what they were telling him to say. And the district court, I mean, the district court said that they weren't, I mean, they didn't know about it, right? I mean, there's a finding from the district court that they didn't have actual knowledge. This is all about whether they should have known about it. The district court said both. The district court said no actual knowledge and no should have known as well. Yeah, answer this question for me. The should have known thing, I mean, I think it's probably a fact finding, but it seems kind of odd that, like, should have known would be a factual determination that a district court would get to make. Do you have any thoughts on that? Well, I struggled with that issue as well, and that's why it doesn't feature prominently in the brief. Should have known generally is subjective. A-plus for Kandor. I have to applaud for Kandor's report. But should have known generally is objective. And what we would, the way I think the analysis would probably go is all of the individual fact findings of the district court. This conversation occurred. This happened at this particular point. That we would do regular, clearly erroneous analysis. I think or suspect that when we're doing then should have known, we would then hop to a de novo review of, do these facts meet this legal standard? That's what I suspect the correct answer is, as opposed to actual knowledge, which would just be a straight fact finding. That's the state, I really didn't, and we would only do clearly erroneous review on that. That was as best I could come up with, but I couldn't find anything entirely clear on that issue. So I want to maybe bring us back a little bit to the AEDPA issue that has been raised. There is this, well the Florida Supreme Court analyzed this claim and rejected it for two reasons. The first was there was no evidence of falsity, and the second was that even if there was, the state had no knowledge of it. And they used the term intended, as Judge Newsom pointed out. But so there are two for our AEDPA analysis, there are two state court, Florida Supreme Court, holdings on that issue. And what has, I think, become clear is really what we're going to focus on here is the D2 issue, whether that was an unreasonable determination of the facts. But what Whitten has pointed out is not that the state court made a factual error. Instead, I think the argument goes, the state court didn't allow him the evidence that he wanted to present, or to present the evidence the way that he wanted. That's not what we look at under Section 2254 D2. I think it's important to read the language of the statute that we're analyzing, and once we get to D2, the language is, resulted in the decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state proceeding. So under D2, I don't think we're looking at whether Mr. Whitten got a full and fair evidentiary hearing, for instance, or whether the state court's factual findings lacked fair support in the record. We're only looking at the admitted evidence at the state evidentiary hearing. And that's it under the language as Congress has now enacted it. I don't know if that's right. Let me just give you a hypothetical about this. Let's just assume that at the state court hearing, the judge had said, like, look, I'm going to make rulings about the admissibility of evidence by flipping this coin. And if it's heads, the evidence comes in. If it's tails, it's out. Wouldn't we say at the end of the day, if the judge is like, based on the admitted evidence that I've admitted through coin flips, you know, I find X, wouldn't we say that's an unreasonable determination of the facts? So, Your Honor, I don't think you would in Federal court. What I think the remedy for that issue is if the judge has a policy of making evidentiary decisions on a coin flip, then that's going to be corrected in state court in the Florida Supreme Court or perhaps by the United States Supreme Court thereafter as a due process-type violation. But what Mr. Whitten's trying to do is, because I think coin flipping for evidentiary hearings probably would violate some kind of due process. Yeah, so I guess what you would say then, I think what you're saying is that that's sort of, that's like you could allege that that process violated your constitutional rights. Maybe in Federal habeas you could say, look, coin flipping as a means of evidentiary admission, you know, violates the due process clause because of some clearly established Supreme Court precedent, but then you'd have to meet that clearly established Supreme Court precedent prong and not just unreasonable determination of the facts. Is that what you're saying? So, I think that would be the right analysis except for this, and this Court has case law on this, that defects in state post-conviction procedures don't get you D1 analysis or relief. So, with that to the side, I think that you're limited to if a trial judge does that, that's going to be pretty clear reversal if you raise that issue appropriately. And as your point, raise it appropriately, you mean take it to the Florida Supreme Court on review of your denial of post-conviction and then assert petition to the U.S. Supreme Court. But on that issue, that's where that's going to stop. Once you start in round three on federal habeas, it's not going to be a D2 error. Correct. Got it. You're really limited to state court and then the United States Supreme Court thereafter for that type of an issue. And I do think it's important to recognize that Congress changed this statute, 2254, with AEDPA. And part of what they took out was all of the full and fair evidentiary hearing stuff. Instead, we do an E1 analysis for a factual determination. Is it rebutted by clear and convincing evidence? If not, we stop. And what Pai tells us is if it is rebutted, then we're going to go and do a D2 analysis. So this idea of kind of blending in the procedures into an unreasonable determination of the facts I think is incorrect based on the statute that we have. There is a remedy for it. The remedy lies in state court to raise that issue prominently and clearly, which Mr. Witten did not do in state court. I do want to discuss a little bit more on the should have known prong. I cited in my brief, it's United States versus Brown, a 1981 Fifth Circuit decision that says you have to show actual knowledge or that the state believes that the testimony was false. And the reason that's significant is because, as I have a footnote about it, but Brown is actually binding on this court. This court has addressed the question, held actual knowledge is required, but because this is an old Fifth Circuit case prior to September of 1981, it binds this court on the actual knowledge element. And I don't think there's any Supreme Court precedent to the contrary on that. Mr. Witten relied extensively on Giglio, kind of one of the seminal prosecutorial misconducts, false testimony claims, and said, well, negligence or design, that's enough. But Giglio was an actual knowledge case. Someone on the prosecution team actually knew that witness was testifying falsely. Well, what about United States versus Aggers, if that's how you pronounce it? The undisclosed evidence demonstrates that the prosecution knew or should have known of the perjury. So if you look at Aggers, Aggers and Kyles versus Whitley, which then cites Aggers, they're both Brady cases. They're not dealing with false testimony claims. And what Aggers cites for that is Mahoney, which is another actual knowledge case. That should have known language really seems to come kind of out of nowhere inexplicably. And that's why, to the best I can tell, they're doing exactly what Mr. Witten was doing. He used that should have known to really refer to a situation of imputation. One prosecutor knew, one prosecutor didn't, we're going to impute. I think that's what the should have known problem is getting at when the Supreme Court is reciting it. But it's really unexplained dictum. It's nothing more than that. Or, I mean, you know, sort of the common sense view would be sometimes people might not say that they know, but it seems pretty clear that they couldn't possibly not know, right? And that's why you have knew or should have known, because that subjective showing is just such a high standard to meet if you have to show that the person somehow indicated that they knew. So, Your Honor, I don't think that you have to have the prosecutor get up and confess. No, I understand that. I'm not suggesting that. I'm just saying sometimes it might appear in notes, whatever the case may be, right? But the point is it's such a high standard. And, you know, I mean, any prosecutor would know that they can't present false testimony. So it would be incredible for them to actually make a note implicating themselves in doing that if they knew that's what they were doing. So that's, I mean, it seems to me that's why you have the knew or should have known, because otherwise it's an impossible standard. Well, Your Honor, I disagree. I think Giglio itself tells us it's not an impossible standard. It's nearly impossible. I think we can say that. And I think that we might see why, as opposed to Brady, for instance. You know, three prongs of Brady, procedural suppression, there's negligence that can be involved. That's totally fine. But when we get to the materiality prong, we do reasonable probability of a different outcome, effectively. That's not the standard when we do false testimony claims. I think because it's such a high standard, and it's so egregious when a prosecutor knowingly puts on false testimony, we require the State to effectively show beyond reasonable doubt that it had no effect on the verdict. I think it's kind of built into the different standards that we use. Yes, this is going to be a harder claim to prove. But once you do that, the State's going to have a really hard road to hoe in regular State court proceedings to get around the, you know, no reasonable possibility of a different outcome. So let me ask you this. So notwithstanding the old Fifth Circuit case, you don't deny that we, the Eleventh Circuit case, have said repeatedly, we've used should-have-known language repeatedly. Is your contention that those are all just wrong because they are effectively controlled by the preexisting precedent? Right. But I will say I have not found and certainly may have overlooked, tried to look through all of them, but a case where this Court actually applied should-have-known, a lot of what I found was inconsistent statements are not enough. In Noriega in 1997, treading close to the line of willful blindness is not enough. And in that, to the best that I could understand in that case, the government had an individual before him, could have asked him a question, elected not to ask the question, that would have shown that ultimately the witness's testimony was false. That's what I found out of this Court, even though I've seen kind of that ode to should-have-known in the case law, it's never actually applied, as far as I could tell, at least. Or maybe, I mean, I think you mentioned earlier one way to connect the dots would be to say should-have-known is really more about imputation. You know, so if you've got a police officer out there that's coaching someone to lie, then you could say the prosecutor should have known, something like that? I think that that's right. And that's what I put in my brief, was when we have these references to should-have-known, based on the cases that came before, Giglio, Mahoney, all of those, it seems like the best reconciliation point is exactly that. We're in the imputation, and I don't care if this particular prosecutor didn't know the testimony was false, if this police officer, or if this other prosecutor on the prosecution team knew that it was false. I think, as best I can tell, that seems to best reconcile what the Supreme Court has said, because otherwise we're just left with really unreasoned dictum in Aggers and Kiles v. Whitley. So, if we were to be able to get past the regular D-2 and D-1 analysis, I do think we still have a separate kind of E-2 question about diligence. And that's because Mr. Whitten in state court had the affidavit that, according to him, was all that he wanted OZO to testify. It actually specifically put, at least in the hands of some state actors, knowledge of, you know, you need to help us, otherwise you're going to spend five years in prison. All of those conversations that he supposedly recounted, that he did recount, that supposedly took place in his affidavit. But Whitten never sought to admit that affidavit in any way, shape, or form in state court. Despite being repeatedly reminded by the state court, this affidavit is not in evidence and will not be considered. I think I, you know, chronicled that pretty extensively in the brief of the multiple times and opportunities where he could have sought to admit that affidavit, and yet did not, but chooses to rely on it in closing argument and then before the Florida Supreme Court. So I think we have an independent diligence question, even if we could get past the D1 and D2, of, well, what about this affidavit? And I don't think the comeback, well, it would have been inadmissible under state law, really helps Mr. Whitten at all, because we don't know that. He never tried to admit the affidavit. And there's something that's interesting about this case that's different from Lightborn, which is what he relies on. As far as I can tell in Lightborn, no witness testified, I'm not coming because of the perjury by contradictory statement statute that Florida has. There was nothing like that in Lightborn. Vice here, that's at least arguably the situation that arose. So a question about what a state court might do as a general rule, might be a little due process, might require something a little bit different if this is the reason that the witness isn't coming forward and testifying. Bottom line is, we don't know because that line of investigation was never pressed by Mr. Whitten. He did not seek to admit the affidavit at any point in time, and that was part of what the state court hung its hat on. He never moved to admit Oseo's affidavit in that section. So I think there's an E2 problem as well, even if we could get past kind of the D1 and D2 stuff. So we'll do Brecht, I guess, at the end, but I do want to focus on the no deal aspect as well, kind of moving away from the confession that, according to the district court, never occurred. It's pretty clear reading the federal evidentiary hearing, there is no explicit promise of a deal. I think that pretty much goes away entirely. And all that you really have for, Mr. Whitten relies on Oseo's clarity, all you really have from Oseo is, I thought that this is what's going on. I thought this and I thought this. He was never, and I think what was probably most compelling to the district court was its own question, did any of the officers that you were having that conversation with in Baxley Carr, did they ever tell you to say, or say anything that you knew was false? No. Did they ever tell you that you'd get some kind of benefit from this? No. There's nothing like that, even in the federal evidentiary hearing, that clearly shows that Oseo had some kind of a deal. And the reason that's significant is, Mr. Whitten, in an oral argument, has said, well, look, there's all this other stuff that Oseo was incorrect about. But that's not what he exhausted in state court. It wasn't all of this generality, it was, as far as I can tell, really two things. Oseo was lying about whether he had a deal or not, and Oseo was lying about hearing Whitten confess. The stuff about the juvenile record, there is nothing about that in the state court record at all. It appears for the first time in the federal record, and the state argued that it shouldn't be admitted, in part because this was never exhausted in state court. So the same with all of the rest of surrounding claims that are being raised now at oral argument. The question before the state court was, deal testimony, false or true? Confession testimony, false or true? That's it. So I think it's incredibly reasonable for them to focus on those particular issues instead of trying to make up this whole other world or universe of things that could have gone wrong. Giglio claims are going to be fact-specific because there's an allegation to witness testified falsely about X. And then we've got to figure out, did the witness testify falsely about X or not? I mean, I just have to say, it's very troubling that you have officers who are talking about another case, saying what they want him to say, Oseo to say, according to, you know, the district court's findings that he lied. And, you know, apparently doing this, if you believe Oseo, and the district court seems to have done so, if, you know, that they're doing this and that it's well known at the jail that by coming forward and essentially making up a story of confession, that you're going to be treated leniently, that, I think in the words of Mr. Oseo, there's going to be a 180-degree turnaround with your jail treatment. I mean, all kinds of privileges that he didn't have previously, much better conditions, et cetera. I mean, there's just something very troubling about that. And that, you know, that the state should be able to escape all responsibility by simply not uttering the words of, would you make this false story? Would you, you know, would you falsely testify? And we'll give you a deal if you do. Well, I mean, I guess in part I have to dispute the premise of the question, which is I don't think by merely being silent, the state can escape anything. It's going to be harder to prove, but implicit deals, if he testifies I had no deal, and he did in fact have an implicit deal, that would violate GICLA code. Right, right. But I think that's part of it, right? I mean, that's part of what we're talking about. It's an unspoken arrangement. You know, it's, you know, when there is such a precedent of it happening with other people and it keeps happening, then obviously people in the jail learn that this is what's expected and this is what will happen if they act in a certain way. I mean, that just seems troubling that the state should avoid any responsibility for doing that by simply not uttering the words. Your Honor, I think the question may go back to something that's even more basic than what we're discussing, which is should the state be able to make deals with people that are in obviously compromised positions? I don't think it does. I don't think it does. I mean, there's a difference between making a deal, you know, if someone comes forward and says, and you say, okay, well, let's hear what you have, there's a big difference in that situation from the situation which is alleged here, which is that the officers situated themselves and spoke about evidence in another person's case in front of Mr. Ozio with the express idea of giving Mr. Ozio all of the information they wanted him to testify to as part of a confession and that it was, you know, known that he would receive better treatment if he did so. And I had a note to come back to this. I do want to directly address, it's again not clear what the officers were saying in the front of that car. And Ozio himself, the only fact, and I'm hoping that I'm right. But he did say he regurgitated what they said, right? That's what he said. His word was they regurgitated what he said, what they said. In very general terms, but when pressed, the only thing that he could remember that the officers told him to say was the blood on Witten's clothes, which he then said, I also did hear that at some point from Witten. I believe that's the federal evidentiary hearing at pages 39 and 49. And the clothes was actually one of the bigger impeachment points at trial because the blood wasn't on Witten's clothes proper. At least they were on the boots. That was the best Ozio could remember for the stuff that they were regurgitating to him. Everything else was very general. And I don't think we should be relying on generalized testimony to say the State actually knew something was false like that. All I'm saying is the district court found him credible, right? I mean, the district court found that he had lied on these various things. And in order to arrive at that conclusion, it necessarily had to find that he got the information from somewhere. And he said he got it from the officers. I mean, that's what the district court found, right? And not quite, Your Honor. So the district court said, yes, he was false. But then said it wasn't clear that anybody from the State would have known that it was false. In part because Witten, or I apologize, Ozio said, I got stuff from lots of places. I got stuff around the jail. I got stuff from prison guards. And I got stuff from the officers in the car. And he couldn't parse out what aspects he got from where. So I don't recall any point in the district court's order where he credited Ozio's testimony. I got all of my facts from the officers themselves. It was definitely the district court found that it was false. But not that he got the false facts from the officers. Could have gotten it from anywhere. And I think... Well, didn't the district court also find that he said he was treated better? He said he was treated better once he made the alleged, you know, once he made the statement that Witten had confessed to him? Yes, he did say that. And that pretty much is clear on the record. I'll point out that I believe Ozio was in prison for, or I apologize, in jail for about two and a half weeks. And that's it. He hadn't even been formally charged at the time that he comes forward with this confession against Mr. Witten. Right, but he was facing a mandatory minimum, right? And that was dropped, and the jury heard that. That was before the jury. Right, so this is in a situation where, I mean, we're looking to see what he lied about. And he had already been sentenced by the time he testified, right? So, I mean, the jury knew what sentence he got for the crime. They knew all that. It wasn't a situation which you see sometimes where, you know, the person is testifying, and it's all about, well, do you have a deal? Because they hadn't been sentenced yet. And so the jury doesn't really know. Like, do they have a deal? Why are they testifying here? Like, they already knew he had gotten out. And he had this, you know, pretty lenient sentence. And then a lot of the fight at trial was then, well, was that the product of the deal? Was that, you know, leniency, whatever? But the jury was definitely well aware of Osio's precarious position and the fact that he was, he did receive favorable treatment, whether it was attributable to a deal or whatever. Well, and I mean, correct me if I'm wrong, but, I mean, since he'd already been sentenced and he'd already gotten out, I mean, he could have just said, you know, forget it, never mind. Like, I don't, you know, I don't care. I don't want to testify. Or was he required to testify? So there is the, he probably would have been beyond the reach of the state of Florida to do much about it. But there is, in his probation, that idea, you've got to come and give truthful testimony. So he could have been violated, I think, theoretically on that. And he was still worried about that all these years later when he refused to come and testify in person, right? I mean, that's, so why would it be, why would we think that he would not be concerned about that, you know, that much closer to his having received the lenient treatment? Your Honor, the jury heard all of that, I guess, is my main concern. So, I mean, I guess, I think your point is like, to the extent there was a deal, it was that he had to come back from Texas to testify as part of his probation. Well, and I'm not even saying that that was part of his probation. No, I'm not saying, but I'm just saying that was a thing that was required of him as part of his probation. Right, absolutely. Okay. Yes, so I agree with that, and the state theoretically could have held that over his head. I don't want to mislead the court on that front. But the idea that he was treated leniently after coming forward, I think, is very clear before the jury. So, passing all that, we would get to Brecht, and I think it's fairly clear there's no substantial injurious effect on the outcome at this point in time. There was abundant evidence that the state had. I don't think we get to use what the prosecutor thought about his case. We've got to look at what was before the jury, and Whitten lying on the stand is something the prosecutor, I don't think, would have anticipated, quite honestly. And particularly the whole back and forth about, I called the victim's mother, spent all afternoon calling her, and then the victim's mother gets up and says, he didn't call me once. I don't think this actually would have made a difference from a Brecht issue. Right. And so here, I mean, we've said, like, over and over again that when the defendant takes the stand and lies, the jury can say, you know what, just based on you lying to us, that makes us think that you are guilty. I mean, here it seems like it's obvious that he lied, at least about the mother thing. I think about the mother thing, I think he lied about whether he knew that Whitten had $1,000 on him. I apologize, McCullough, I have too many names.  Whether the victim at all had $1,000 on him. His first story to the police is, I didn't even go into the van, didn't know what was happening. And then it evolves into, well, I went in, I helped him fill out the receipt, but I didn't really know how much he had. I think there's multiple lies. What was his explanation for giving the wrong license plate? So he said, I gave it because Mauldin was drunk and I was worried basically he'd be tearing up the hotel and everything like that. That was his explanation. I don't really know that's all that powerful when he just a few days earlier was giving the right license plate at a different hotel, but that was his explanation nonetheless. Your Honors, on the prior record stuff, it's not exhausted. It was inappropriately raised in federal habeas for the first time and there's no reason to grant relief on an unexhausted and procedurally barred issue. Regarding the mitigation issue, I think Thornell v. Jones pretty much kills it with the heavy aggravation that we have here and really the minimal additional mitigation. With that, the Secretary requests this Court affirm. All right. Thank you, Counsel. Mr. Gunn, you've reserved six minutes. Thank you. I just want to make one point about Osio's testimony generally and to the extent this Court scrutinizes it for inconsistencies or precision in recalling the events. I think it's important to keep in mind that when the federal evidentiary hearing was held, Osio was 48 years old. He's trying to recall events when he was 18 years old at trial and 26 when he signed the affidavit, respectively. So I think, you know, you might see some variation, but he's never wavered since the year 2000 on this core story of, I made this up and the state knew and they put me up to it. As to actual knowledge, Mr. Rodriguez quoted Noriega on the issue of whether willful blindness or constructive knowledge satisfies the standard, but he left out the second part of the quote. So the quote is, the government appears to have treaded close to the line of willful blindness, but the rest of that quote is, the crossing of which might establish constructive knowledge to satisfy Giglio. And there's another case, Jacobs v. Singletary, cited in the respondent's brief, where the Court analyzes whether a witness's story changed to such an extent that it became incredible, not less credible. So I think the Court's decisions have applied this constructive knowledge concept. Back to the, on the AEDPA issue, we're not relying on a totally process-based argument. This Court in Landers, as the Court said in Pye, declined to adopt an approach to D2 that's all process-based, but the Court never said that process doesn't factor into the analysis. And I would point the Court to an opinion from Judge Easterbrook in the Seventh Circuit in Levy-Kink, which we cited in our brief. And Judge Easterbrook says, a state court's refusal to consider evidence can render its decision unreasonable under D2, even when its legal analysis satisfies D1. States cannot insulate their decisions from federal review by refusing to entertain vital evidence. And there's a case we cited from the Tenth Circuit that's on similar grounds, that substance and procedure are often hard to disentangle. You have to consider them together. But we did discuss the process and also the resulting findings that are clearly erroneous under E1. As for the E2 issue, the affidavit without Luzio's testimony was not admissible. It's not just light-borne. There's another case we cite in our reply brief where the Florida Supreme Court says when the witness does not testify, the affidavit cannot be admitted. And the Florida Supreme Court has said that over and over again. I think it's just ironic for the court to block Luzio's testimony and then reject the claim based on Witten not offering the affidavit, which he was proffering with the expectation that Luzio would testify. And the Circuit Court actually made an alternative finding. It said... But then it said... So we know that the Circuit Court would have doubled down on the same line that Luzio wasn't going to subject himself to a perjury charge for telling the truth, and therefore it's fine to just not consider his evidence at all. As to the cross-examination stuff that was being discussed, you know, Luzio was thoroughly cross-examined as to the deal. Both Giglio and this court in Guzman have talked about. In Giglio, I think they said it was a vigorous cross-examination, and the same in Guzman. But the court in Guzman was clear that that's a factor that has to be weighed in the analysis. But the fact that defense counsel vigorously cross-examined is not fatal to the idea that it was impactful. Yes. As to the issue Judge Brasher raised about Brecht and calling the mother, I don't think that swayed the jury too much because Maureen Fitzgerald also testified that Whitten did come over and they did try to call the mother together. So the mother testified she never received a call, but I wouldn't take that as particularly strong evidence of a murder. Again, there's no murder weapon. There's no DNA. In fact, there's DNA that matches a third party. Without the snitches, there's a blood type match, but that matches to 40% of the population. So I think if you take away Ozio and McCullough, the jury was significantly impacted by that testimony under Brecht. But isn't there a DNA match that was done later, like in 2000-something, that does show Malden's DNA on the inside of the right boot? The state conducted new DNA testing for state post-conviction, but they never ended up presenting it. And it does not refute the third-party finding that Agent Ziegler found, and there's no indication the state's trying to construct theories about which part of the boot was tested by who. But there's just no strong evidence about it all. The state's never put on its new DNA evidence until it tried to... So your point is, A, it doesn't... You're not making an actual innocence argument anyway, so it doesn't really matter for that. But maybe for prejudice it might matter, because if we were to vacate and order further proceedings and the case were to be retried, we would certainly expect that the state would put on the new DNA evidence. And I think that's where it should occur. I mean, if the court finds the Giglio error and it was impactful under Brecht, it should remain for a new trial, and then the state could present that evidence. But I think bringing it at this point and trying to say that we can just retry the case here under this law and justice theory is not how it works. That if the court finds the error, and the court has emphasized on a number of occasions for Brecht, it does not matter if the court believes the defendant is guilty. The focus has to be on the impact to the minds of the jurors. So if the court finds that, I think it should vacate the conviction and remain for a retrial. And at that point, the state can present whatever evidence it has left. Thank you. All right. Thank you, counsel. And we'll be in adjournment. All rise.